NOT RECOMMENDED FOR PUBLICATION

No. 17-5892

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DETRIA C. REED | ) | **FILED** |
| | ) | May 30, 2018 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF MEMPHIS, TENNESSEE; JESSE | ) | ON APPEAL FROM THE |
| SANDLIN; JAMES KIRWOOD; PRESTON | ) | UNITED STATES DISTRICT |
| MORTON; CURTIS PRICE | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendants-Appellees. | ) | |
| | ) | |
| ANTHONY MULLINS; GREGORY SANDERS; | ) | |
| FRANK HANNAH | ) | |
| | ) | |
| Defendants. | ) | |

BEFORE:  MOORE, GIBBONS, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.  This case escalated out of a private dispute between two Memphis Police Department ("MPD") officers, one of whom (Detria Reed) entered into a contract with the home-improvement business of the other (Jesse Sandlin).  First, Reed terminated the contract.  Then he sued Sandlin for breach of contract in state court.  Then Sandlin counterclaimed for breach of contract.  Then Reed's wife called MPD about the competing suits.  Then she filed a complaint with MPD's Internal Affairs Department (Economic Crimes), alleging that Sandlin's business was not properly licensed.  Then Mrs. Reed filed a criminal incident report with MPD naming Officer Sandlin as the suspect.  Then Sandlin filed a theft report alleging that the Reeds possessed some of his tools and would not respond to his texts asking to return them—ultimately

leading to Reed's arrest. Finally, following his arrest, Reed filed the current action alleging, among other things, a federal-law claim for excessive force, a federal-law claim for false arrest, and a state-law claim for defamation. The district court properly put an end to this escalating chain of events. Reed was not detained in an excessively forceful manner, the officers had probable cause to arrest Reed, and Sandlin was entitled to summary judgment on Reed's defamation claim because Reed failed to fulfill his duty under Federal Rule of Civil Procedure 56. This resolution, however, does not mean that much good judgment was shown on either side in this case.

Detria Reed and Jesse Sandlin were both police officers with MPD, and both worked at Raines Station. In 2014, Sandlin also operated Right Price Fencing Company, a home-improvement business. On February 20, 2014, Reed contracted with Right Price Fencing to perform work on his home. The contract stated that Right Price Fencing would complete the work by March 15, 2014, in exchange for $7,250. Right Price Fencing began work on Reed's home, for which Reed paid Right Price Fencing a total of $6,000, but the company did not complete the project by March 15. On May 10, 2014, Reed informed Sandlin that he wanted to terminate the contract, and he wanted a refund of $2,900 so that he could find another contractor to complete the work. Litigation ensued: Reed and his wife filed a breach of contract suit against Sandlin, citing Sandlin's failure to complete the home-improvement project on time, and Sandlin responded with a countersuit for breach of contract, alleging that the home-improvement contract had been terminated improperly.

The private dispute eventually spilled into Raines Station. In late May 2014, Reed's wife called MPD to inform it about the pending civil litigation, and the investigator told Mrs. Reed that her complaint would be "noted as a civil matter."[1] On June 16, Reed informed MPD about the

---

[1] MPD Policies and Procedures state that "[g]enerally, an Officer of the Memphis Police Department is not authorized to enforce the civil law or settle civil disputes unless a breach of the peace occurs or is about to occur."

civil dispute, and Mrs. Reed filed an internal affairs complaint with Economic Crimes, alleging that Sandlin had falsely represented himself as a licensed contractor. Finally, on July 8, Mrs. Reed filed an incident report, naming Sandlin as a suspect, and both Reeds gave statements against Sandlin to Economic Crimes later that day.

That afternoon, Col. James Kirkwood, Commander of Raines Station, called Reed into his office to discuss the Reeds' complaints against Sandlin. Kirkwood, along with Lt. Col. Gregory Sanders, attempted to persuade Reed to handle his dispute with Sandlin in civil court. But Reed declined to withdraw his complaints, insisting "I want my money back." During the meeting, Kirkwood and Sanders learned that Reed possessed some of Sandlin's tools that he had left at Reed's home. Kirkwood asked what it would take to settle the dispute to avoid further escalation, and Reed told him that "if [Sandlin] gives me my money back I'll give him his tools back."

Also on July 8, Sandlin filed a theft report, naming the Reeds as suspects. Sandlin alleged that the Reeds possessed some of Right Price Fencing's tools, valued at $1,176, and would not return them. Sandlin had left several of Right Price Fencing's tools—including a compressor, buckets, and painting equipment—in Reed's garage. Shortly after Reed terminated the contract, Sandlin texted Reed on at least two occasions asking him to return Right Price Fencing's tools or to place the equipment outside Reed's garage. While Reed returned the compressor to Sandlin at Raines Station, he did not bring all of Right Price Fencing's tools back, even though Sandlin texted him about the remaining equipment.

Shortly after Reed arrived to work on July 9, Kirkwood told him about Sandlin's theft report. Reed met with Kirkwood and other Raines Station administrators, and because it is MPD's policy to relieve from duty officers who are listed as suspects in criminal complaints, Reed was placed on administrative leave and required to turn over his weapon and paraphernalia. Because

Reed and Sandlin both worked at Raines Station, Kirkwood authorized the case to be moved to Airways Station to avoid conflicts of interest and to maintain the integrity of the investigation. Lt. Preston Morton from Airways was tasked with investigating the report. After Reed was relieved of duty, Morton asked if Reed would like to go to Airways to give a statement, and Reed agreed to go voluntarily. Airways officers, Sgt. Curtis Price and Det. Miranda Jones, then took Reed to Airways to be interviewed. Reed was not handcuffed during the ride to Airways, and he was taken in an unmarked police car.

When Reed arrived at Airways, Price and Jones placed him in an interrogation room. Reed was not restrained when he was placed in the interrogation room, and he remained unrestrained while Jones interviewed him about Sandlin's theft report. During the interview, Reed admitted having tools belonging to Officer Sandlin at his home, which corroborated what Kirkwood had learned during his meeting with Reed the day before.[2] After the interview, Morton instructed Price to secure Reed's right ankle to a bench using a leg cuff. The MPD maintains a policy that "[d]etainees should have at least one leg secured to the bench[,] [and] [d]etainees will only be handcuffed or secured to fixed or immovable objects that are designed for that purpose." Reed could adjust the restraint on his ankle so that it was comfortable because he had his own handcuff key, and he never informed Jones, Price, or any other officer that the restraints were too tight or uncomfortable.

After the interview, Reed signed a form giving the officers consent to search his home. MPD officers took Reed, unrestrained, to his home in an unmarked police car to retrieve the tools. Reed retrieved Sandlin's tools from his garage and turned them over to Sandlin, who had been

---

[2] Reed "disputed" Price's and Memphis's Statement of Undisputed Material Fact, attached to their motions for summary judgment, that Reed "admitted to having tools belonging to Officer Sandlin at his home," but Reed's response— "DISPUTED. [Reed] testified that Officer Sandlin has left some tools in [Reed's] home"—belies any actual dispute on this point.

brought to Reed's home. Reed then returned to Airways—again, unrestrained and in an unmarked police car—where he was formally arrested and he gave a formal statement to Jones. Finally, around 10 p.m., approximately 14 hours after arriving at work, Reed was released.

On July 6, 2015, Reed filed a complaint alleging false arrest, false imprisonment, excessive force, assault and battery, and defamation. Reed named the City of Memphis, Sandlin, and several individual MPD officers, including Kirkwood, Morton, and Price, as defendants.[3] Reed amended his complaint on December 30, 2015, adding a claim against Sandlin for breach of contract and adding a claim against Memphis for failure to train and supervise.

Following discovery, the parties cross-filed motions for summary judgment. Morton attached a personal affidavit to his motion for summary judgment, and Memphis attached an affidavit from MPD Director, Michael Rallings, to its motion for summary judgment. Reed moved to strike these affidavits because, according to Reed, they contradicted Morton's and Rallings's deposition testimony.

On June 6, 2017, the district court ruled on the parties' summary-judgment motions as well as Reed's motions to strike the Morton and Rallings affidavits. The district court denied Reed's motions to strike the affidavits, holding that an affidavit is not a pleading that is subject to a motion to strike under Rule 12(f). The district court also granted summary judgment in favor of Memphis and the individual officers. With respect to Reed's claims against the individual officers, the court determined that there was probable cause to arrest Reed based on Sandlin's theft report and Reed's interview with Jones. The court also determined that the officers' use of a leg cuff to secure Reed to the interview room bench did not constitute excessive force because the restraints were never unduly tight and because Reed had a key to adjust the restraints. Because the district court

---

[3] Reed initially also brought claims against Officers Anthony Mullins, Frank Hannah, and Gregory Sanders, but he voluntarily dismissed those claims prior to the district court's summary judgment decision.

determined that no constitutional violation had occurred, it accordingly dismissed Reed's claims against Memphis, because all of his § 1983 claims, including for failure to train, required a showing that there had been a violation of rights. Finally, the district court granted Sandlin's motion for summary judgment on Reed's defamation claim, but the court denied Sandlin's motion for summary judgment on Reed's breach of contract claim.[4]  Reed timely appealed.

On appeal, Reed alleges four errors by the district court.  First, Reed argues that the district court abused its discretion when it denied his motions to strike Morton's and Rallings's affidavits. Second, Reed argues that MPD's policy directing officers to secure a detainee's leg to a fixed or immovable object while the detainee is in a temporary detention room violated the Fourth Amendment.  Third, Reed argues that probable cause did not exist at the time he was arrested. Finally, Reed argues that the district court improperly dismissed his defamation claim against Sandlin.  However, none of Reed's arguments has merit.

First, the district court did not abuse its discretion when it denied Reed's motions to strike the Morton and Rallings affidavits.  Affidavits are not pleadings subject to motions to strike under Rule 12(f), and the district court did not rely on the affidavits to reach its summary judgment decisions.  While "court[s] may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," Fed. R. Civ. P. 12(f), an affidavit is a not a "pleading" as defined in Rule 7(a).  We have observed that Rule 12(f) "does not make provision for testing the legal sufficiency of affidavits by a motion to strike." *Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966).  Therefore, courts should generally consider a motion to strike an affidavit as a matter of the "admissibility of the evidence offered in the affidavit, and the

---

[4] Prior to the district court's entry of final judgment, Reed and Sandlin settled the breach of contract claim.

competency of the affiant to testify to the matters stated therein." *Id.* "These issues are present in every instance where affidavits are filed pursuant to Rule 56." *Id.*

When a portion of an affidavit does not comport with Rule 56, the court should disregard that portion. *Id.*; s*ee also Ondo v. City of Cleveland*, 795 F.3d 597, 604–05 (6th Cir. 2015). Here the district court appeared to disregard the substance of both Morton's and Rallings's affidavits— in effect granting Reed the relief he sought. Instead, pursuant to Local Rule 56.1, the court drew the facts from the parties' Statements of Undisputed Material Facts, which were attached to each motion for summary judgment, and where Reed alleged that a fact was in dispute, the court looked to the record. Indeed, to the limited extent that the district court evaluated the affidavits for purposes of ruling on Reed's motions, its review benefited Reed. The district court considered whether the affidavits created a dispute of material fact that would defeat summary judgment, but ultimately determined that "neither of the [affidavits] create[d] a dispute of material fact relevant to the Court's findings." Because the district court disregarded the affidavits' content when ruling on the parties' motions for summary judgment, any conceivable error in failing to strike the filings was harmless.

Moreover, Reed's argument that the sham affidavit doctrine, described in *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986), required the district court to strike the Morton and Rallings affidavits is unpersuasive. The doctrine prevents *nonmoving* parties from creating an issue of material fact to defeat summary judgment by filing affidavits that contradict their own earlier deposition testimony, *id.*, and we have expanded the doctrine to permit courts to disregard "an affidavit from one defendant, which directly contradicts his prior sworn testimony, submitted by the *plaintiffs* to defeat summary judgment motions from *other defendants*," *see France v. Lucas*, 836 F.3d 612, 623–24 (6th Cir. 2016). But the doctrine does not fit where the *moving* party files

an allegedly contradictory affidavit with his or her motion for summary judgment. *See Smith v. Cty. of Lenawee*, 2011 WL 1150799, at * 12 (E.D. Mich. Mar. 28, 2011), *aff'd in part*, *rev'd in part on other grounds*, 505 F. App'x 526 (6th Cir. 2012).

"[W]e generally apply the sham affidavit doctrine against a party who attempts to *avoid* summary judgment," *France*, 836 F.3d at 623–24 (emphasis added), because it "invariably reflect[s] the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact" that would defeat summary judgment. *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006). But the logic and purpose of the doctrine do not apply when a party *moving* for summary judgment submits an allegedly contradictory affidavit with its summary judgment motion. A party moving for summary judgment has no incentive to create issues of fact that undermine his or her summary-judgment motion.

Moreover, for parties opposing summary judgment, extending the sham affidavit doctrine to require courts to strike contradictory affidavits filed by moving parties is a solution without a problem. "If an affidavit conflicts with the deposition testimony of a summary judgment *movant*, the opposite party receives the *benefit* of the conflict under the requirement that evidence is construed in the light most favorable to the non-moving party." *See Smith*, 2011 WL 1150799, at * 12 (emphasis added). "Self-contradiction by the moving party's witnesses may of course create a genuine issue of material fact precluding summary judgment." *Crockett v. Abraham*, 284 F.3d 131, 133 (D.C. Cir. 2002). Indeed, as already noted, the district court considered whether the affidavits created a genuine issue, and that consideration benefited Reed. But the court ultimately determined that the affidavits did not create a dispute of material fact, and the court did not rely on them for purposes of ruling on the pending summary judgment motions. Thus, the district court

did not abuse its discretion when it denied Reed's motions to strike the Morton and Rallings affidavits, and indeed properly considered whether the affidavits created an issue of fact.

Second, Reed argues that MPD's policy that detainees in temporary detention rooms should have at least one leg secured to a bench is unconstitutional because it "admits of no exception," requiring detainees to be cuffed regardless of the facts surrounding their detention. But Reed's argument is unpersuasive, because nothing in the policy requires officers to restrain detainees in a facially unconstitutional manner, or provides that they may do so. MPD's Temporary Detention Room Procedures states that "[d]etainees should have at least one leg secured to the bench[,] [and] [d]etainees will only be handcuffed or secured to fixed or immovable objects that are designed for that purpose." It is true that the "reasonableness" inquiry in an excessive-force case turns on "whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting them," *Graham v. Connor*, 490 U.S. 386, 397 (1989), but on its face MPD's policy does not compel officers to violate *Graham* or to employ unreasonable force. The policy does not *require* detainees be cuffed to a bench regardless of the facts and circumstances confronting the officers. The policy merely establishes a default procedure—"[d]etainees *should* have at least one leg secured to the bench"—that is reasonably calculated to ensure the safety of officers and detainees. Indeed, MPD maintains additional handcuffing policies providing that certain "persons being detained by officers relative to a criminal investigation" may be excepted from handcuffing, and that "[w]hen a prisoner is handcuffed, the handcuffs are not to be used to punish or inflict pain."

More importantly, "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion of the individual's Fourth Amendment interests against the countervailing governmental interests

at stake." *Id.* at 396 (internal quotation marks omitted). MPD's policy generally sanctions only a minimal intrusion on a detainee's Fourth Amendment interests, while the government's interests in officer and detainee safety as well as the management of detainees in the police station are great. This balance of interests further demonstrates that MPD's policy is generally constitutionally permissible. Therefore, unlike cases where a city's policy compels unconstitutional conduct, and thus a constitutional violation flows directly from the policymaker's deliberate choice reflected in the official policy, *see*, *e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), MPD's policy alone does not support Reed's excessive-force claims.

That is not to say that handcuffing is *per se* reasonable. *See Kostrzewa v. City of Troy*, 247 F.3d 633, 645 (6th Cir. 2001). There may be circumstances where a handcuffing pursuant to MPD's policy is excessively forceful, and we have reasoned that in weighing individuals' Fourth Amendment interests against the government's interest, "the 'nature and quality of the intrusion' must include consideration of the severity of any injury inflicted." *Martin v. Heideman*, 106 F.3d 1308, 1312 (6th Cir. 1997). Thus, a plaintiff may support his or her § 1983 claim for excessively forceful handcuffing by showing that "(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005)). But the undisputed facts here make clear that Reed never told anyone that he was uncomfortable or that the leg restraint was too tight. Indeed, Reed possessed a key that allowed him to adjust the leg cuff as he pleased. Thus, Reed's excessive force claim against the individual officers fails, *see id.*, and accordingly so does his claim against Memphis, *see Am. Postal Workers Union v. City of*

*Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).

Next, there was sufficient probable cause to arrest Reed. "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014)). In Tennessee, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent," Tenn. Code Ann. § 39-14-103, and, at the time of Reed's arrest, theft of property valued at more than $500 was a felony, Tenn. Code Ann. § 39-14-105(a)(2) (amended 2017).[5] "Deprive" is defined, *inter alia*, as to "[w]ithhold property or cause it to be withheld for the purpose of restoring it only upon payment of a reward or other compensation. . . ." Tenn. Code Ann. § 39-11-106(a)(8)(B). Reed was "seized" for purposes of the Fourth Amendment following his interview with Jones, when Morton instructed Price to secure Reed's leg to the bench in the interview room. At that point a person in Reed's position would not have felt free to leave. Indeed, Reed testified that when he was moved to the suspect bench and restrained he realized that the investigation "was real and [he] w[as] being questioned about a theft at that point." But during his interview with Jones, Reed admitted having Sandlin's tools at his home.[6] Reed's inculpatory statements reinforced what he had told Kirkwood the day before—that he was exercising self-help, and he would not return Sandlin's tools until Sandlin paid him. Reed's statements to Jones corroborated some of the material facts in Sandlin's theft report, *i.e.*, that Reed was knowingly exercising control over Sandlin's tools. Moreover, it is undisputed that the items

---

[5] Although it does not affect our analysis, the district court cited the updated version of Tenn. Code Ann. § 39-14-105(a)(2) in its decision, which sets the felony threshold for theft of property at more than $1,000. But the version of § 39-14-105(a)(2) in place at the time of Reed's arrest placed the felony threshold at more than $500. *See* Tenn. Code Ann. § 39-14-105(a)(2) (amended 2017).

[6] Again, Reed "disputed" he admitted to having tools belonging to Officer Sandlin at his home, but Reed's response demonstrates that there is no actual dispute on this point. *See supra*, footnote 2.

listed in Sandlin's theft report were valued at more than $500. Thus, at the time of Reed's arrest, there was probable cause to believe that he had committed a felony.

Reed, however, contends that he was arrested earlier at Raines Station based on Sandlin's theft report alone, and "[a]n allegation by one individual that items in another's possession actually belong to h[im] is not enough to create probable cause that a crime has been committed," *Gardenhire v. Schubert*, 205 F.3d 303, 317 (6th Cir. 2000). But Reed's argument fails for two reasons. First, even assuming that Reed was arrested at Raines Station, notwithstanding the analysis above, there was still probable cause to arrest Reed. The day before Reed's arrest, he had made inculpatory statements to Kirkwood and Sanders indicating that he was exercising control over Sandlin's tools and was unwilling to return them unless Sandlin paid him. Those statements, in conjunction with Sandlin's theft report, were sufficient to warrant a reasonable officer in believing that Reed had committed or was committing an offense.

Second, and more fundamentally, Reed conceded in the district court that when Morton asked him if he would like to go to Airways and give a statement he responded, "[y]eah, I'll go," and Reed plainly "AGREED" that it was undisputed that he went to Airways voluntarily, presumably to cooperate with the investigation. There is no Fourth Amendment seizure where, without more, a person voluntarily consents to accompany officers to the police station. *See United States v. Mendenhall*, 446 U.S. 544, 557–58 (1980). Reed now regrets that concession and points to testimony that he claims undermines the voluntariness of his trip to Airways. But under Local Rule 56.1(b), "[a]ny party opposing [a] motion for summary judgment must respond to each fact set forth by the movant by either: (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." All of the evidence Reed cites now on appeal to refute

voluntariness was available below, but Reed chose to "AGREE[]" that he went to Airways voluntarily. Based on Reed's response and Local Rule 56.1, the district court reasonably considered the fact that Reed voluntarily accompanied Price and Jones to Airways undisputed for summary judgment purposes.

Finally, the district court properly granted Sandlin's motion for summary judgment on Reed's defamation claim because Reed failed to carry his burden under Rule 56. Sandlin argued before the district court that summary judgment on Reed's defamation claim was appropriate for two alternative reasons. First, Sandlin argued that Reed's defamation claim was filed outside the applicable statute of limitations period. Second, Sandlin argued that his police report was truthful, citing record facts to support his contention. As the district court observed, Reed addressed Sandlin's statute of limitations argument, albeit in a short, four-sentence section of his response, but he simply failed to respond to Sandlin's argument that the theft report's contents were truthful, "put[ting] forth no facts to dispute [Sandlin's] position." "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "the nonmoving party bears the 'burden of producing in turn evidence which would support a jury verdict,'" *Marie v. Am. Red Cross*, 771 F.3d 344, 351 (6th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986); Fed. R. Civ. P. 56(c). Thus, because Reed failed to designate specific facts creating a material issue in response to Sandlin's motion, the district court properly granted Sandlin's summary judgment motion.

On appeal Reed argues that the district court disregarded evidence that might have demonstrated a genuine dispute of fact, apparently ignoring his failure to address the issue below.

But Reed's argument fails, because when Reed declined to address Sandlin's arguments below or direct the court to specific facts demonstrating a genuine dispute, the district court was not required to comb the record *sua sponte* in search of factual disputes. *Guarino v. Brookfield Twp. Tr.*, 980 F.2d 399, 404–05 (6th Cir. 1992). "[T]he free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not," because "[e]ffectively searching the record for 'genuine issues' requires . . . an adroit knowledge of the core issues of proof in the case along with an ability to recognize how various threads of testimony, woven together, could possible defeat a dispositive motion." *Id.* at 406. Thus, in *Guarino* we explicitly rejected the argument that "after remaining mute at the trial court level" appellants can claim on appeal that the district court erred by failing to come up with its own theory of what material facts might be in dispute. *Id.* Furthermore, the evidence Reed cites in his appellate briefing to demonstrate that there was a genuine factual dispute about the truthfulness of Sandlin's report is nowhere to be found in his response to Sandlin's summary judgment motion in the district court. We will not entertain for the first time on appeal Reed's argument that there was a genuine factual dispute about the truthfulness of Sandlin's report because, generally, arguments that were not adequately raised or preserved in the district court are consequently waived on appeal. *See Brickner v. Voinovich*, 977 F.2d 235, 238 (6th Cir. 1992); *see also United States v. Seventeen Firearms*, 170 F. App'x 418, 419–20 (6th Cir. 2006); *Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs*, 85 F.3d 257, 261 (6th Cir. 1996). Because Reed did not carry his burden under Rule 56, the district court properly dismissed his state-law defamation claim.

The judgment of the district court is affirmed.